UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN MODERN HOME | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16 CV 215 CDP |
| | ) | |
| AARON THOMAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This case arises out of a fire that occurred in Aaron and Aimee Thomas's

apartment on January 3, 2014. The Thomases made a claim on their renter's

insurance policy, but their insurer, American Modern Home Insurance Company,

has yet to determine the claim. American Modern brought this declaratory

judgment action in February 2016 seeking a declaration that there is no coverage

under the policy. In their counterclaim, the Thomases seek a declaration that they

are entitled to recover on the policy. They also raise claims of vexatious refusal to

pay and intentional infliction of emotional distress. The case is set for trial

beginning October 9, 2018, and the parties have filed motions to exclude certain

expert testimony at trial. I will grant these motions in part and deny them in part. I

will also deny the parties' motions for partial summary judgment.

In its complaint, American Modern contends that the Thomases' claim is not

covered under the insurance policy because 1) the fire was intentionally set by or at the direction of the Thomases, 2) the Thomases engaged in fraudulent and dishonest conduct in relation to their claim, and 3) the Thomases failed to cooperate and failed to comply with their responsibilities related to the investigation and their claim. The Thomases deny American Modern's allegations and themselves seek a declaration that they are entitled to recover under the policy. In addition, the Thomases bring a claim of vexatious refusal to pay, arguing that American Modern made lengthy, abusive, and unwarranted record requests; engaged in dilatory tactics in its purported investigation of the insurance claim; and refused to pay on the claim without reasonable cause for over two years before bringing this action. Aimee Thomas also contends that she suffered severe emotional distress because of the extreme and outrageous tactics American Modern used during its handling of the claim, including the repeated accusations made to her by fire investigators that she set the fire and their attempts to make her confess under veiled threats of criminal prosecution, losing custody of her daughter, and her husband being suspended from National Guard training.

## Motions to Exclude Experts

The parties have moved to exclude the testimony of fire cause and origin experts and insurance industry experts under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), and its progeny. The purpose of

such motions is to ensure that only reliable and relevant expert testimony is presented to a jury. *Russell v. Whirlpool Corp.,* 702 F.3d 450, 456 (8th Cir. 2012).

The opinion of a qualified expert witness is admissible if:  1) it is based upon sufficient facts or data, 2) it is the product of reliable principles and methods, and 3) the expert has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.; *see also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012).  A party's mere disagreement with an expert's assumptions and methodologies does not warrant exclusion of expert testimony. *David E. Watson*, 668 F.3d at 1015.  If a party thinks other assumptions and methodologies are more appropriate, it may make this apparent through cross-examination and its own expert witnesses. *Id.*  "[Q]uestions of conflicting evidence must be left for the jury's determination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 930 (8th Cir. 2001) (internal quotations marks and citation omitted).

I have substantial discretion in determining whether expert testimony should be allowed. *Russell,* 702 F.3d at 456.  If I am satisfied with the expert's knowledge, skill, experience, training, or education, and the expert's testimony is reasonably based on that expertise, admitting the testimony is not an abuse of discretion. *Daubert,* 509 U.S. at 588-91; *Weitz Co. v. MH Washington,* 631 F.3d 510, 527 (8th Cir. 2011).  I should resolve doubts regarding an expert's testimony in favor of admissibility. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758

(8th Cir. 2006). However, if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded. *Bonner*, 259 F.3d at 929-30.

Against this backdrop, I turn to the issues raised by the parties in relation to the proffered expert testimony in this case.

A.    Fire Cause and Origin Experts

Each side has proffered the opinions and testimony of fire cause and origin experts. American Modern's two experts, Dan Bruno and John Nordyke, opine that the fire was incendiary in nature and originated on the floor in the passageway between the dining room and kitchen with ignition of flammable liquid. The Thomases' expert, Jim Kuticka, opines that the fire was accidental and originated on the stove when overheated vegetable oil ignited in a pot upon removal of the pot's lid.

Neither side challenges the personal educational, training, or experience qualifications of the other's expert(s) to testify generally in the area of fire origin and cause. However, they challenge the opposing experts on other grounds.

1.    *Dan Bruno*

Dan Bruno is the Fire Marshal of the West County EMS and Fire Protection District who responded to the fire during the afternoon of January 3, 2014, and conducted the subsequent investigation. Bruno's examinations of the fire scene

included taking photographs, making diagrams, measuring charred trusses, and moving debris to observe burn and char patterns.   Bruno interviewed the Thomases; received statements from friends, family, and acquaintances of the Thomases; reviewed cell phone messages between the Thomases; and reviewed Aimee Thomas's 911 emergency call.   He researched the litigation history of the Thomases, contacted and spoke with the Thomases' insurance adjuster at American Modern, and conducted a recorded interview of Aimee Thomas jointly with American Modern's fire investigator, John Nordyke.   From his observations and the information gathered during this investigation, Bruno formed various hypotheses and eliminated each of them except for the fire being intentionally set. He based this conclusion on several factors, including what he considered to be a liquid pour pattern on the floor extending from the kitchen to the dining room, the extent of fire damage when considering the time elapsed between the 911 call and fire suppression, the location of the most extensive fire damage, and the Thomases' demeanor and statements.

The Thomases argue that the methodology used by Bruno to determine origin and cause was not consistent with NFPA 921 and that his opinion must therefore be excluded.   NFPA 921 is a well-accepted standard set forth by the National Fire Protection Association by which fire investigations are to be conducted.   It requires that hypotheses of fire origin be carefully examined against empirical data obtained

from the fire scene and appropriate testing.  *See Fireman's Fund Ins. Co. v. Canon USA, Inc.*, 394 F.3d 1054, 1057-58 (8th Cir. 2005); *see also Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 645 (8th Cir. 2009).   While an expert who purports to follow NFPA 921 must apply it reliably or his testimony may be excluded, *Manuel v. MDOW Ins. Co.*, 791 F.3d 838, 845 (8th Cir. 2015), NFPA 921 is not the only reliable way to investigate a fire.   *Russell*, 702 F.3d at 455. Therefore, a fire expert's reliance on a methodology other than NFPA 921 does not render his opinion unreliable *per se*.   *Id.* at 455-56.

Bruno does not claim that he followed and applied NFPA 921's provisions in his investigation of the fire.   His failure to follow NFPA 921 therefore cannot serve as basis to exclude his expert opinion on cause and origin.   *Russell*, 702 F.3d at 455-46.   The issue, then, is whether Bruno's methodology in forming the bases of his opinion is otherwise sufficiently reliable.   I find that it is.

In the context of fire investigations, an expert opinion formed on the basis of observation and experience may meet the reliability threshold if the expert observed the relevant evidence, applied his specialized knowledge, and systematically included or excluded possible theories of causation.   *Shuck v. CNH America*, 498 F.3d 868, 875 (8th Cir. 2007).   *See also Russell*, 702 F.3d at 456-58 (opinion testimony permitted where fire expert's methodology was based on observation and experience); *Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1257 (8th

Cir. 2006) (same). This is what Bruno did here. During the course of his investigation, Bruno gathered evidence, formed hypotheses as to the possible origin and cause of the fire, systematically evaluated the evidence against these hypotheses, and reached conclusions as to the validity of his hypotheses based on specific observations of the evidence in this case and his experience in fire investigation. This method is sufficiently reliable. *See Russell*, 702 F.3d at 457; *Hickerson*, 470 F.3d at 1257. I will therefore deny the Thomases' motion to the extent they seek to exclude Bruno's expert opinion regarding the origin and cause of the fire. The Thomases' challenges to Bruno's credibility and the credibility of his opinion based on bias, taint, and unethical conduct are proper subjects for cross-examination.

I agree with the Thomases, however, that Bruno is not qualified to render an opinion on the meaning of a person's emotional responses, motivations, or veracity. Although Bruno can testify as a lay witness to factual descriptions of a person's conduct and their interactions with him (e.g., smiling, calm, crying), I will not permit him to testify as to how he believed any person felt based on their conduct (e.g., satisfaction, pride), or to his own subjective characterization of any person's conduct (e.g., "beyond bizarre," "beyond abnormal"). *See Daubert*, 509 U.S. at 590 ("knowledge" under Rule 702 "connotes more than subjective belief or unsupported speculation"); *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*,

No. 08-0840-CV-W-ODS, 2012 WL 3047308, at *6 (W.D. Mo. July 25, 2012) ("experts cannot offer opinions regarding historical facts or matters of intent, motivation, or other thought processes"); *Amica Mut. Ins. Co. v. Willard*, NO. 4:07CV1745 DDN, 2009 WL 2982902, at *5 (E.D. Mo. Sept. 14, 2009) (expert may not testify in a fashion that characterizes a person's state of mind).

Nor is Bruno qualified to render an expert opinion as to the value of the contents of the Thomases' apartment for insurance purposes. *See Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) (area of witness's competence must match the subject matter of the witness's testimony). I will likewise grant the Thomases' motion to exclude Bruno's opinion evidence on this basis.

Accordingly, I will grant in part and deny in part the Thomases' motion to exclude expert opinion evidence from Dan Bruno.

2.    *John Nordyke*

John Nordyke is the fire cause and origin expert hired by American Modern to investigate the fire. He opined that the fire was intentionally set and started with an open flame that ignited an ignitable liquid on the floor between the kitchen and the dining room. I will exclude his expert report and opinion testimony as to the cause and origin of the Thomas fire.

Contrary to American Modern's insistence otherwise, Nordyke testified that

he follows NFPA 921's guidelines in his fire investigations and followed NFPA 921's scientific method in his investigation of the Thomas fire. He specifically testified that he used his experience and applied the scientific method with a systematic approach consistent with NFPA 921. (Nordyke Depo., ECF 193-2, at pp. 48-49, 81-90; ECF 193-4, at pp. 423-28.) An expert who purports to follow NFPA 921 must apply it reliably or his testimony may be excluded. *Manuel*, 791 F.3d at 845.

Although Nordyke purported to follow NFPA 921 in this investigation, a review of his report and his deposition testimony shows that he did not do so reliably to the facts of the case. NFPA 921 requires that hypotheses of fire cause and origin be carefully examined against empirical data obtained from fire scene analysis and appropriate testing. Nordyke admittedly conducted no tests to rule out any hypotheses other than his poured-ignitable-liquid hypothesis – and even that testing yielded negative results for the presence of an ignitable liquid. But despite the empirical testing data that tended to disprove that hypothesis, Nordyke continued with his ignitable-liquid theory and ultimately concluded that to be the cause of the fire. For the following reasons, this conclusion is unreliable.

Nordyke testified that he first formed two hypotheses: that the fire started with boiling oil on the stovetop or that it started with electrical wiring. He asked American Modern to provide an electrical engineer for evaluation of his second

hypothesis, but his request was denied. He ultimately eliminated this hypothesis after he concluded that the origin of the fire was at the kitchen/dining room entryway and he saw no electrical outlets there.

With respect to the overheated-oil hypothesis, Nordyke admittedly conducted no testing to determine whether this could be a valid cause. He did not conduct any experiments or modeling, and his request to American Modern for such modeling went unanswered. Nor did he review any relevant articles or literature, or any experiments performed by others. Nor did he consider the scientific basis of how such a fire could occur. Without testing or engaging in any systematic analysis, Nordyke determined to eliminate this hypothesis for two reasons: 1) the paint on the stove did not burn,[1] and 2) the fire did not start on the stovetop but instead started in the entryway. (ECF 193-2, at p. 285; ECF 193-4, at pp. 422, 387-89, 435-37.)

Nordyke hypothesized that the fire originated in the kitchen/dining room entryway and was caused by someone igniting an ignitable liquid with an open flame. Based on his past experience, he hypothesized that ignitable liquid was poured on the floor, on the front of the stove and refrigerator, on the countertops, and inside the refrigerator. Upon looking at photographs, looking at the scene, and

---

[1] Although Nordyke acknowledged that paint used on the surface coating of a stovetop is likely more resistant to heat than other paints, he conducted no testing to determine whether the paint here in fact would have burned. (ECF 193-2, at p. 285.)

talking with other investigators, he concluded this hypothesis to be valid and adopted it as his conclusion. At his deposition, Nordyke testified that he tested his origin hypothesis, that is, that the fire started in the entryway, by "thinking it through." (ECF 209-1, at p. 192.) As to cause, Nordyke testified that he tested this hypothesis "by looking at the scene. . . . What other way could this fire have started other than a liquid poured on the floor and whatever else, objects were in the room. . . . And I came to the conclusion that that was the only way this fire started. It just – nothing else passed the hypothesis test." (ECF 193-4, at p. 446.) When asked how he concluded that the fire started with an open flame, Nordyke testified that that was what he "imagined." (*Id.* at p. 454.) "The liquid would have to ignite somehow and the only way I can think of to open – to ignite an ignitable liquid would be an open flame." (*Id.* at p. 455.) Merely looking at a scene and developing conclusions based on experience with no testing or analysis is inconsistent with and contrary to the methodology set out in NFPA 921. *Presley*, 553 F.3d at 646 (citing *Pro Serv. Automotive, L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1215-16 (8th Cir. 2006); *Weisgram v. Marley Co.*, 169 F.3d 514, 519 (8th Cir. 1999)). IT is also inconsistent with any other "scientific method" that Nordyke claimed to have used. Moreover, Nordyke's statement that he "imagined" that an open flame ignited the fire because he could think of no other way indicates that that opinion is too speculative for it to be admissible. *Lloyd's Acceptance Corp. v. Affiliated FM Ins.*

*Co.*, No. 4:05 CV 1934 DDN, 2013 WL 4776277, at *15 (E.D. Mo. Sept. 6, 2013).

It also appears that Nordyke engaged in conduct that would lead to bias in and/or taint of the investigation in direct contravention of NFPA 921. First, during Aimee Thomas's January 23 recorded interview, Nordyke acquiesced in Dan Bruno's admitted method of lying and making threats to Aimee to coerce a confession, even going so far as to state to Aimee that he (Nordyke) would report to charging authorities that she had given inconsistent statements regarding the fire:

> BRUNO:     I can't – I don't, I don't press charges.   I don't arrest people.   That's not my job, it's not what I'm in charge with –
>
> NORDYKE: What we do is pass information onto to the people that do that, ok?   And if what you are telling us is not the same that – what you said today is not the same as what you said on the day of the fire is basically what we're trying to get at here.   Okay.   The information – the information doesn't jive [sic].

(ECF 193-3, at p. 5.)   Although Nordyke testified at his deposition that Bruno did not share with him his opinion that the fire was incendiary before Nordyke completed his own report (ECF 209-1, at p. 168), Bruno repeatedly stated in Nordyke's presence during the January 23 interview that they knew the fire was not accidental and that evidence from the scene did not match the story of an accidental fire.   (*See generally* ECF 193-3.)   Nordyke did not conduct his scene examination until January 29, and he made his final report on February 2.   Considering Bruno's statements made during Aimee's interview (and their tone), Nordyke was aware of Bruno's opinion and his reasons therefor well in advance of completing his own

investigation and report.

Furthermore, Nordyke also testified that during his examination of the fire scene on January 29, he and two other fire investigators (including Bruno) discussed their findings and agreed to each other's conclusions. In addition, Nordyke referred to Bruno's draft report in his own final report regarding the incendiary nature of the fire, despite Nordyke's acknowledgment that reviewing Bruno's report prior to him completing his own report would be inappropriate.

For several reasons, including those set out above, I find John Nordyke's expert opinion to be unreliable in the circumstances of this case. Therefore, given the considerable discretion I have in determining whether expert testimony should be allowed, I will exclude his expert report and opinion testimony in their entirety.

3.    *Jim Kuticka*

The Thomases retained Jim Kuticka to conduct a fire cause and origin analysis from all available information, documents, and evidence relating to the fire. American Modern moves to exclude Kuticka's expert opinion in its entirety, arguing that the contingent-fee nature of Kuticka's compensation[2] renders his testimony suspect. Alternatively, American Modern argues that Kuticka should not testify regarding Bruno's and Nordyke's investigations because he used a different

---

[2] Because counsel was court-appointed, Kuticka has agreed to accept a reduced hourly fee if the Thomases do not prevail.

methodology than Bruno and Nordyke.[3]   I will deny American Modern's motion to exclude.

Questions regarding Kuticka's bias and credibility are matters to be resolved by the jury, including the extent to which any financial interest in the outcome of the case may affect his opinions.   *Taylor v. Cottrell, Inc.*, 795 F.3d 813, 820 (8th Cir. 2015).   Because these questions can be addressed on cross-examination, I will deny American Modern's motion to exclude on this basis.   Likewise, questions regarding Kuticka's methodology and the extent to which his methodology differs from that used by other cause and origin experts in the case are more appropriately explored through cross-examination and do not warrant excluding his testimony.   *David E. Watson*, 668 F.3d at 1015; *Bonner*, 259 F.3d at 930.

American Modern's Motion to Exclude and/or Limit the Testimony of Jim Kuticka is denied.

B.     Insurance Industry Experts

Each side proffers expert testimony on insurance industry practices and standards, which is relevant to claims of vexatious refusal to pay.   *See Lloyd's Acceptance Corp.*, 2013 WL 4776277, at *11.

Professor Jeffery Thomas, secured by the Thomases, is an attorney and law

---

[3] In its motion to exclude, American Modern also argues that I should not allow Kuticka to testify regarding the investigation and conclusions of Carl Welcher.   In its reply brief, however, American Modern concedes that my later ruling on a related issue renders this argument moot.

professor who teaches insurance law in Missouri and focuses his research on insurance law. He has thirty years' professional experience, which includes authoring several insurance-related journal articles and book chapters; acting as editor-in-chief of insurance treatises and law journals; giving several presentations on insurance-related matters, such as liability, bad faith, breach of duty, public policy, and ethics; and working with various bar associations and the American Law Institute on matters related to insurance coverage, regulation, and liability.

American Modern secured Lewis Crist to serve as its expert. Mr. Crist retired in 2016 after having worked fifty-five years in the insurance industry in various capacities: as branch manager of an insurance company, the Director of Insurance for the State of Missouri's Department of Insurance, an individual consultant, a board member of several multi-line insurance companies, and a board member of companies providing and underwriting healthcare insurance. Both Professor Thomas and Mr. Crist have served as expert witnesses on insurance-related matters in various proceedings.

Although their source of expertise differs, each of the parties' insurance industry experts is qualified to give testimony as an expert witness. *See Certain Underwriters at Lloyd's v. SSDD, LLC*, No. 4:13-CV-193 CAS, 2014 WL 3097284, at *2 (E.D. Mo. July 7, 2014) (whether expert witness is qualified depends on whether his training and experience demonstrate knowledge of the subject matter;

that experience must bear a close relationship to the expert's opinion). *See also American Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 726 (8th Cir. 2015) (gaps in expert's qualifications or knowledge go to weight of testimony, not admissibility); *United States v. Rose,* 731 F.2d 1337, 1346 (8th Cir. 1984) ("An expert witness need not be an outstanding practitioner in the field nor have certificates of training in the particular subject."). I will therefore deny the parties' respective motions to the extent they argue that their opponent's expert is not qualified.

Both experts were secured to provide opinion testimony on industry standards of conduct and claims-handling requirements imposed on insurance companies in Missouri and to apply these standards to the facts of this case. In short, both experts would testify as to whether American Modern handled the Thomases' insurance claim according to the standards and practices of the insurance industry and whether American Modern acted reasonably in processing their claim. I find that this testimony will be useful and will assist the jury in determining the issue in this case. *Cedar Hill Hardware & Constr. Supply, Inc. v. Insurance Corp. of Hannover*, 563 F.3d 329, 343-44 (8th Cir. 2009) (industry-wide practices are relevant to question of whether insurer acts within acceptable boundaries based on information received in a given case).

American Modern seeks to exclude Professor Thomas's expert opinion,

however, arguing that his sole opinion is that American Modern acted vexatiously, which is a legal conclusion outside the realm of expert testimony. Similarly, the Thomases seek to exclude Mr. Crist's report and opinion to the extent he opines on whether American Modern violated the Missouri vexatious-refusal-to-pay statutes. I agree that an expert may not intrude on the Court's role to instruct the jury as to the law and testify to a legal conclusion. *See Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003); *Certain Underwriters at Lloyd's*, 2014 WL 3097284, at *6. Therefore, I will not permit these experts to testify concerning the legal standard of vexatious refusal to pay under Missouri law or to their opinion as to whether or not American Modern's conduct was vexatious under Missouri law.

With respect to Professor Thomas, I do not agree with American Modern that his opinion is limited to only legal conclusions. In his report and as he testified at his deposition, Professor Thomas also opines that American Modern's handling of the Thomases' claim was inconsistent with industry custom and practice. This opinion is permissible and is not rendered inadmissible merely because it may be grounded in part on Professor Thomas's understanding of Missouri law. "It does not invade the province of the Court for an expert to testify that an insurance company departed from insurance industry norms, where the testimony is based in part on the expert's understanding of the requirements of state law." *Certain*

*Underwriters at Lloyd's*, 2014 WL 3097284, at *6. Nor will I exclude Professor Thomas's report and testimony on the basis of any financial interest in the outcome of the case. As noted above regarding witness Kuticka, any questions regarding bias and credibility are to be resolved by the jury and can be addressed on cross-examination. *Taylor*, 795 F.3d at 820.

As to Mr. Crist, the Thomases' argument that his opinion is based on an erroneous assessment of the facts is a challenge to the opinion's credibility and not its admissibility. The Thomases' motion to exclude on this basis will therefore be denied. *Bonner*, 259 F.3d at 929. The Thomases' challenge to Mr. Crist's methodology of relying on his experience in the industry is likewise more properly the subject of cross-examination and of competing expert testimony rather than exclusion. I cannot say that Mr. Crist's expert report or his related testimony is so unreliable that the jury should not even consider it. *Id.* at 929-30.

Resolving all doubts in favor of admissibility, I will permit the parties to present the expert testimony of their competing experts on insurance industry custom and practice. *See ABT Sys., LLC v. Emerson Elec. Co.,* 4:11CV00374 AGF, 2013 WL 490174, at *1 (E.D. Mo. Feb. 8, 2013) ("it is decidedly the jury's role to evaluate the weight to be given the testimony of dueling qualified experts.") (internal quotation marks and citation omitted). They may testify as to industry standards in general, proper claims handling, and the effect of certain information

and circumstances on claims decisions. *See Cedar Hill Hardware*, 563 F.3d at 343; *Certain Underwriters at Lloyd's*, 2014 WL 3097284, at *6. They may offer their opinion on whether any of American Modern's actions deviated from insurance industry customs and practices, but they may not testify to a legal conclusion that the alleged conduct was or was not vexatious under Missouri law.

To the extent American Modern seeks to exclude Professor Thomas's rebuttal opinions and testimony, arguing that they address matters not contained in Mr. Crist's report and thus are outside the proper scope of rebuttal, I will consider the scope of any rebuttal evidence at trial and limit it at that time if necessary. I will therefore deny American Modern's motion to exclude Professor Thomas's rebuttal opinion evidence.

C. Undisclosed Expert – John Trawicki

John Trawicki was deposed on December 28, 2017, as the records custodian and Rule 30(b)(6) representative of Sprint for purposes of authenticating and providing testimony regarding certain cell phone records that were obtained from Sprint. During his deposition, Trawicki was asked and testified about entries on the Thomases' cell phone records from the date of the fire, including several details about the calls (such as time and duration of each call; whether the call was voice or text; whether a call was answered, went to voicemail, or terminated before completion; whether a call was made from a phone or another device, etc.).

Trawicki was also asked and provided testimony about the location of cell phone towers to which the Thomases' cell phone(s) connected that date as well as other information regarding how cell phone towers operate, how location data is obtained, and how to use cell phone and tower data in determining cell phone location.

I agree with the Thomases that Trawicki's testimony about how cell phone towers operate and how location data is derived therefrom "fits easily into the category of expert testimony" governed by Rule 702, *United States v. Hill*, 818 F.3d 289, 296 (7th Cir. 2016), because it involves specialized and technical knowledge "not readily accessible to any ordinary person." *United States v. Yeley–Davis*, 632 F.3d 673, 684 (10th Cir. 2011).[4] But because American Modern never disclosed Trawicki as an expert witness, the Thomases move to exclude his testimony.

I may exclude from evidence at trial any matter that was not properly disclosed in compliance with my pretrial orders. *Brooks v. Union Pac. R.R. Co.*, 620 F.3d 896, 899 (8th Cir. 2010). This applies to a party's failure to disclose an expert witness as required by a pretrial scheduling order. In my Case Management Order entered October 5, 2016, I ordered American Modern to disclose all of its case-in-chief expert witnesses and provide the reports required by Fed. R. Civ. P.

---

[4] *See also United States v. Natal*, 849 F.3d 530, 533 (2d Cir. 2017) ("[W]e hold that testimony on how cell phone towers operate constitutes expert testimony and may not be introduced through a lay witness."); *United States v. Graham*, 796 F.3d 332, 365 (4th Cir. 2015) (witness testimony providing "technical details about operations performed by cell sites and how calls are routed through network switches . . . [is] clearly 'based on scientific, technical, or specialized knowledge within the scope of Rule 702.'"), *adhered to in part on reh'g en banc*, 824 F.3d 421 (4th Cir. 2016); *United States v. Medley*, 312 F. Supp. 3d 493, 497-98, 501 (D. Md. 2018).

26(a)(2) no later than December 2, 2016. I also ordered American Modern to make these expert witnesses available for depositions, and have depositions completed, no later than January 13, 2017. Although several amended CMOs extended deadlines relating to other categories of expert witnesses, these particular deadlines did not change. Regardless, there is no dispute that American Modern never disclosed Trawicki as an expert witness.

A party must make expert disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). "The power of the trial court to exclude exhibits and witnesses not disclosed in compliance with its discovery and pretrial orders is essential to the judge's control over the case." *Sellers v. Mineta*, 350 F.3d 706, 711 (8th Cir. 2003) (internal quotation marks and citation omitted). A party who fails to provide information as required by Rule 26(a), or fails to do so in a timely manner, may not use that information or witness unless its failure to comply with the Rule is harmless or substantially justified. Fed. R. Civ. P. 37(c)(1); *United States v. STABL, Inc.*, 800 F.3d 476, 487 (8th Cir. 2015).

American Modern argues only that it was not required to disclose Trawicki as an expert because Trawicki does not provide expert testimony as defined under Rule 702. For the reasons stated above, I disagree. Because American Modern provides no other explanation for its failure to comply with Rule 26(a) as ordered, I do not find its failure to be substantially justified. Nor is American Modern's

failure to disclose this expert harmless in the circumstances of this case.

Questionable discovery practices, serial arguments over document production, and

several modifications to the discovery schedule litter the record in this case, showing

the lengthy and contentious nature of the pretrial discovery process.   Although

Trawicki's deposition testimony was obtained nine months before trial, it

nevertheless came over a year after American Modern was ordered to disclose its

experts, therefore depriving the Thomases of that time to secure their own expert on

the subject.   Any further extensions of the discovery schedule to accommodate

American Modern's failure to comply with my orders and with the federal rules

likely would have resulted in an additional continuance of this already

much-delayed trial.

I have considered the remedies available for failure to disclose, *see Wegener*

*v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008); *Trost v. Trek Bicycle Corp.*, 162 F.3d

1004, 1008 (8th Cir. 1998), and find the Thomases' request to exclude all of

Trawicki's testimony to be too severe a sanction.[5]   I will permit him to testify as a

records custodian to authenticate the cell phone records at issue and to testify as a lay

witness regarding the content of these records.   I will exclude, however, any

testimony that enters the realm of scientific, technical, or specialized knowledge,

---

[5] Although the title of this motion seeks to exclude only the expert testimony of this witness, the
motion itself can be read to seek exclusion of *all* of Trawicki's testimony.

including – but not necessarily limited to – testimony as to how cell phone towers operate, how location may be determined from historical cell site billing records, how a cell phone connects to a particular cell tower within a cell phone network, and analysis of variables that influence cell site signal strength.

## Motions for Partial Summary Judgment

American Modern Home moves for summary judgment on the Thomases' claims for vexatious refusal to pay and for intentional infliction of emotional distress. The Thomases move for summary judgment on each of the parties' claims for declaratory judgment on policy coverage. I will deny the motions.[6]

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). I must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. *Scott v. Harris,* 550 U.S. 372, 379 (2007).

A.   <u>Vexatious Refusal to Pay</u>

American Modern contends that it reasonably believed that the Thomases

---

[6] To the extent the Thomases also move for summary judgment on American Modern's separate claim that it has no duty to defend or indemnify the Thomases against a claim by Thiemann Real Estate, LLC, the motion is moot. This claim was dismissed with prejudice after counsel for Thiemann represented to the Court that it would not seek any recovery from the Thomases and American Modern agreed to dismiss the claim.

intentionally set the fire and that, given the Thomases' claim that the fire was accidental, there existed an open question of fact regarding the nature of the fire. American Modern argues that it was therefore entitled under Missouri law to obtain a judicial determination of this factual question without being penalized for vexatious refusal to pay. The Thomases argue that, regardless of this open question, American Modern's recalcitrant and vexatious attitude is nevertheless shown by its two-year delay in initiating judicial action, the added delay of over two years spent in litigation, and its general conduct and attitude during the delay – including its reliance on a flawed investigation.

"The existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *DeWitt v. American Family Mut. Ins. Co.,* 667 S.W.2d 700, 710 (1984). *See also TAMKO Bldg. Prod., Inc. v. Factual Mut. Ins. Co.*, 890 F. Supp. 2d 1129, 1141-42 (E.D. Mo. 2012); *Starr Indem. & Liab. Co. v. Continental Cement Co.*, No. 4:11CV809 JAR, 2013 WL 1442456, at *19 (E.D. Mo. Apr. 9, 2013). "Where there is evidence an insurer unreasonably relied on the results of its own investigation, the question is for the jury." *Pace Props., Inc. v. American Mfrs. Mut. Ins. Co.*, 918 S.W.2d 883, 888 (Mo. Ct. App. 1996).

On the evidence before the Court, there are genuine issues of material fact surrounding American Modern's conduct in its failure to pay on the Thomases'

claim, including its delayed filing of the instant litigation, the tactics used during the course of its investigation of the Thomases' claim, and whether its reliance on its own investigation was reasonable in the circumstances of the case. The question is therefore to be decided by a jury. *Pace*, 918 S.W.2d at 888; *Nationwide Affinity Ins. Co. of Am. v. Deimund*, No. 1:16CV298 ACL, 2018 WL 3159076, at *6 (E.D. Mo. June 28, 2018).

I will deny American Modern's motion for summary judgment on the Thomases' claim of vexatious refusal to pay.

B. Intentional Infliction of Emotional Distress

Aimee Thomas's claim for intentional infliction of emotional distress is not limited to only the conduct that occurred on January 23, 2014, during Bruno and Nordyke's interview of her. Aimee's claim is based on the abusive nature of the investigation as a whole and not just the January 23 interview. Given that this is evident from the plain language of the Thomases' counterclaim, I will not address American Modern's contrary argument further. Because American Modern's only argument for summary judgment on this claim is that the circumstances of the January 23 interview could not alone give rise to intentional infliction of emotional distress attributable to American Modern, I will deny American Modern's motion for summary judgment on the claim.

To the extent American Modern argues that it cannot be liable for the conduct

of Bruno and/or Nordyke during the January 23 interview for the reason that they were not employees of American Modern, it is reasonable to infer that American Modern was nevertheless aware of the allegedly abusive tactics used by Bruno and Nordyke during their recorded interview of Aimee when it engaged in the allegedly abusive tactics used thereafter during the course of its investigation. Given that American Modern considered the January 23 interview in its determination that the fire was intentionally set, the interview can reasonably be found to be part and parcel of American Modern's investigation.

To the extent American Modern argues that the alleged conduct was not extreme or outrageous, constituted nothing more than trivialities, and was not solely intended to cause emotional distress, there are more than sufficient factual disputes to preclude entry of summary judgment on these questions and to submit them to a jury. The Thomases have presented evidence from which a reasonable factfinder may find that the insurance investigation into their claim included and/or was based on admitted lies directed to them, coercion to confess to criminal conduct, veiled threats to remove their child from their custody, criminal prosecution, and discharge from military service. I cannot find as a matter of law that this alleged conduct is not so outrageous in character, extreme in degree, or utterly intolerable in a civilized community such that an average community member would not consider the conduct to be outrageous. *See Gillis v. Principia Corp.*, 832 F.3d 865, 874 (8th Cir.

2016).

Finally, based on the evidence submitted by the parties, I cannot conclude that Aimee Thomas's claimed migraine headaches, anxiety, depression, vomiting, sleeplessness, and other impairments were not medically significant. American Modern's motion for summary judgment on this basis will also be denied.

C.    Policy Coverage

The Thomases argue that if the Court strikes American Modern's fire cause and origin experts under *Daubert*, then American Modern cannot establish that the fire was intentionally set and thus cannot recover on its claim of no policy coverage. The Thomases go on to argue that, because American Modern cannot prove its defense to policy coverage without expert testimony, then they are entitled to recover under the policy given that the evidence establishes that they suffered an accidental loss due to fire. Because the Thomases' motion is dependent entirely on the exclusion of American Modern's experts, and I have determined that Dan Bruno can testify to his opinion at trial, I will deny this motion for summary judgment.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Aaron and Aimee Thomas's Motion to Preclude Any Testimony or Exhibit from Disclosed Expert John Nordyke [193] is GRANTED.

**IT IS FURTHER ORDERED** that Aaron and Aimee Thomas's Motion to

Preclude Any Testimony or Exhibit from Disclosed Expert Dan Bruno [194];

Motion to Preclude Any Testimony or Exhibit from Disclosed Expert Lewis Crist

[195]; and Motion to Preclude Any Expert Testimony or Exhibit from John Trawicki

[197] are GRANTED IN PART and DENIED IN PART.

**IT IS FURTHER ORDERED** that American Modern Home Insurance

Company's Motion to Exclude the Testimony of Professor Jeffrey Thomas [165] is

GRANTED IN PART and DENIED IN PART.

**IT IS FURTHER ORDERED** that American Modern Home Insurance

Company's Motion to Exclude and/or Limit the Testimony of Jim Kuticka [166] is

DENIED.

**IT IS FURTHER ORDERED** that American Modern Home Insurance

Company's Motion to Exclude and/or Limit the Rebuttal Testimony of Professor

Jeffrey Thomas [191] is DENIED, but without prejudice to be reasserted at the time

of trial.

**IT IS FURTHER ORDERED** that American Modern Home Insurance

Company's Motion for Partial Summary Judgment on Counts II and III of the

Counterclaim [161] is DENIED.

**IT IS FURTHER ORDERED** that Aaron and Aimee Thomas's Motion for

Summary Judgment [196] is DENIED as to Count I of American Modern's

complaint, and DENIED AS MOOT as to Count II of the complaint.

**IT IS FURTHER ORDERED** that a **final pretrial conference** will be held on **Thursday, October 4, 2018 at 11:00 a.m.** in Courtroom 14-South.   The case remains set for a jury trial beginning **October 9, 2018.**

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 17th day of September, 2018.